IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

JOHN A. WILSON (AIS #150109)                :

    Plaintiff,                                              :

vs.                                                              :          CIVIL ACTION 09-00552-CG-N

GREGORY ADAMS, et al.,                         :

    Defendants.

## REPORT AND RECOMMENDATION

Plaintiff, an Alabama prison inmate proceeding pro se and in forma pauperis filed a Complaint under 42 U.S.C. § 1983. This action was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.2(c)(4), and is now before the undersigned on Defendants' motion for summary judgment (Doc. 16, 17, 24)[1] and Plaintiff's Opposition thereto. (Doc. 20). For the reasons stated below, it is recommended that Defendants' motion for summary judgment be granted and that Plaintiff's action be dismissed with prejudice.

## I. SUMMARY OF FACTUAL ALLEGATIONS

From its review of the record, the Court summarizes the parties' allegations which are material to the issues addressed in this Report and Recommendation. On March 1, 2009, while incarcerated in the segregation unit at Holman Correctional Facility ("Holman"), Plaintiff placed his radio outside his cell door so that a "runner" could pass the radio to another inmate in another cell for repairs. (Doc. 1 at 8; Doc. 17 att. 1 at 1). Defendant, Correctional Sergeant Gregory Adams, observed the radio on the floor and confiscated it pursuant to a prison regulation

---

[1] Defendant Jonathan Levin has adopted (docs. 31 and 32) the Answer and Special Report filed by Defendants Gregory Adams and Jeremy Watson (doc. 16 and 17).

prohibiting segregation inmates from passing items from one cell to another. (Doc. 17, att. 1 at 1, 12). Standard Operating Procedure 9-013 provides that such items will be confiscated and destroyed. (Id. at 12).

Later that day, at approximately 7:00 p.m., Correctional Officer Jonathon Levins removed Plaintiff from his cell and took him to the shower area of the segregation unit. (Doc. 1 at 8; Doc. 17, att. 1 at 1). According to Plaintiff, upon arriving at the shower, he told Officer Levins that he wanted to see Sergeant Adams about his radio. (Doc. 1 at 8). Officer Levins instructed Plaintiff to place his hands outside the shower door to be uncuffed. (Id. at 9). Plaintiff complied and allowed Officer Levins to remove the handcuffs from his left hand. (Id.). However, before Officer Levins could remove the cuff from Plaintiff's right hand, Plaintiff again insisted that he be allowed to speak with Sergeant Adams about his radio. (Id.). Officer Levins said, "no" and instructed Plaintiff to "turn back around so he could recuff him" because he was not going to be allowed to take a shower. (Id.). Plaintiff refused to turn around or be recuffed and continued to insist that he be allowed to see Sergeant Adams. (Id.).

Defendant Adams was in the adjacent cubicle and observed Plaintiff and Officer Levins arguing and came into the shower area. (Id.). Plaintiff told Adams that he wanted a "property sheet" for his radio, or he wanted his radio back. (Id.). Defendant Adams replied, "you ain't getting nothing like that" and "started to walk off." (Id.). Officer Levins then snatched Plaintiff's right arm, which was still cuffed, "pulling [Plaintiff] into the door, causing [Plaintiff's] head to hit the door and the handcuff to cut into his right arm-wrist," and he yelled at Plaintiff "to turn around." (Id.). Plaintiff refused and told Officer Levins that he "hadn't

showered, and he was going to shower." (Id. at 10). Officer Levins then "grabbed the handcuffs attached to [Plaintiff's] right arm, with both hands pulling his right arm all the way out of the shower door tray slot and started to beat it up and down on the door tray slot violently, seven or eight times." (Id.). Defendant Adams watched what was happening and finally told Officer Levins "don't break it." (Id.). Officer Levins released Plaintiff's arm and stepped back. (Id.). Defendant Adams then sprayed "mace" into the shower stall, and Plaintiff "st[u]ck[] both arms out the door to be handcuffed as he [was] coughing and eyes burning." (Id.). According to Plaintiff, Officer Levins then opened the shower door, pushed him to the ground, beat him with his fist, and dragged him to the elevator. (Id.). Once inside the elevator, Officer Levins put his knee in the middle of Plaintiff's back and pushed Plaintiff's face into the floor. (Id.). Defendant Adams and six other officers accompanied them on the elevator. (Id.). After leaving the elevator, the officers picked Plaintiff up and threw him, head first, while handcuffed, into an iron gate, "busting his head open on the right side of his temple above the right eye." (Id. at 11). According to Plaintiff, the officers beat him all the way to the prison health care unit and taunted him by asking him if he still wanted his radio.[2] (Id.).

Plaintiff arrived at the health care unit at 7:00 p.m., whereupon a nurse examined him and noted on his chart that he was "hostile [and] yelling, 'I want to die.'" (Doc. 17, att. 1 at 4). The nurse further noted a laceration approximately three and a half centimeters long, five millimeters deep, above Plaintiff's right eyebrow, that was "bleeding profusely." (Id.). At approximately

---

2 The affidavit of fellow inmate Octavius Buford, submitted by Plaintiff in response to Defendants' motion for summary judgment, states that he witnesses Officer Levins violently jerking Plaintiff's arm and striking Plaintiff's arm multiple times with a baton, that he observed Defendant Adams spraying "mace" into the opening in the shower door, and that he observed Defendant Adams and Officer Levins kicking, stomping, and dragging Plaintiff to the elevator. (Doc. 20). For purposes of this motion, the Court assumes those facts to be true. Inmate Buford states, however, that he "could not hear the conversation [between Plaintiff and the officers] in detail at all." (Id.).

7:15 p.m., the nurse contacted Dr. Robert Barnes, the prison physician, and he recommended that Plaintiff be taken to a local hospital for further treatment. (Doc. 17, att. 1 at 4; Doc. 17, att. 3 at 5). At approximately 7:45 p.m., Officers transported Plaintiff to North Baldwin Infirmary where he underwent a CT scan of his brain revealing no hemorrhaging or fracture, as well as an x-ray of his right elbow, revealing no fracture or dislocation. (Doc. 17, att. 3 at 5; Doc. 1 at 11; Doc. 24, att. 1 at 5, 10). Plaintiff received stitches for the cut above his right eye and returned to Holman at approximately 11:15 p.m., whereupon he was placed on the health care unit ward for observation. (Doc. 17, att. 1 at 3; Doc. 17, att. 3 at 5; Doc. 24, att. 1 at 5).

On March 4, 2009, Plaintiff was charged with a disciplinary violation for violating prison rule number 56, failure to obey a direct order. (Doc. 17, att. 3 at 17). The disciplinary charged Plaintiff with "refus[ing] a direct order from Correctional Officer Jonathon Levins to place your other arm [o]utside the shower door to be handcuffed resulting in a use of force." (Id.). On March 24, 2009, Defendant, Correctional Sergeant Jeremy Watson, presided as hearing officer over Plaintiff's disciplinary hearing and found Plaintiff guilty of violating prison rule number 56, sentencing Plaintiff to forty-five days disciplinary segregation. (Doc. 17, att. 3 at 18). Warden Sylvester Folks approved Sergeant Watson's decision on March 27, 2009. (Id.).

## II. PROCEDURAL ASPECTS OF THE CASE

On August 26, 2009, Plaintiff filed the present § 1983 action, alleging that Defendant Adams deprived him of his personal property, a radio, without due process of law in violation of his rights under the Fourteenth Amendment; that Defendant Adams and Correctional Officer Levins used excessive force against him in violation of his rights under the Eighth Amendment; and that Defendant Watson violated his due process rights under the Fourteenth Amendment by

4

proceeding with a disciplinary hearing against him without first having Plaintiff's mental health status evaluated. (Doc. 1 at 8, 10-12). Plaintiff seeks compensatory and punitive damages, as well as injunctive relief. (Id.).

In the Special Report and Answer filed on behalf of Defendants Adams and Watson on May 28, 2010, and adopted by Defendant Levins on February 2, 2011, Defendants deny Plaintiff's allegations and assert various defenses, including absolute and qualified immunity.[3] (Docs. 16, 17, 31, 32). Defendants further deny the use of excessive force against Plaintiff and maintain, to the contrary, that only reasonable force was used to subdue Plaintiff after he became belligerent and violent when officers attempted to remove him from the shower and escort him to the health care unit. (Doc. 17 at 6; Doc. 17, att. 1 at 2). Defendants also deny that Plaintiff's due process rights were violated. (Doc. 17 at 11; Doc. 17, att. 2 at 1; Doc. 17, att. 1 at 1).

On June 1, 2010, the Court ordered that Defendants' Special Report and Answer be treated as a motion for summary judgment. (Doc. 18). On June 15, 2010, Plaintiff filed an affidavit of inmate Octavius Buford in response to Defendants' motion for summary judgment.

---

[3] Plaintiff does not specify whether he is suing Defendants in their official or individual capacities or both. Thus, the Court will consider both. As state officials, Defendants are entitled to absolute immunity from suit for damages in their official capacities. See Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1278 (11th Cir. 1998) (state officials sued in their official capacities are protected from suit for damages under the Eleventh Amendment). In addition, "[q]ualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Dalrymple v. Reno, 334 F.3d 991, 994 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)). In this case, qualified immunity is not available with respect to Plaintiff's claim of excessive force. See Skrtich v. Thornton, 280 F.3d 1295, 1301 (11th Cir. 2002). Therefore, the only claims to which it could apply are Plaintiff's due process claims. Until recently, when considering the applicability of qualified immunity, the Court followed the mandatory procedure of Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled in part, Pearson v. Callahan, __ U.S. __, 129 S. Ct. 808, 818, 172 L. Ed. 2d 565 (2009). That procedure required the Court to determine whether the Plaintiff's allegations, if true, established a constitutional violation and, if the first step was satisfied, to determine whether the right at issue was clearly established at the time of the alleged misconduct. While that procedure is now discretionary, as opposed to mandatory, see Pearson, id., the Court finds it beneficial in this case. Having found herein that Plaintiff's evidence does not establish a constitutional violation,

(Doc. 20). On October 18, 2010, the Court ordered Defendants to supplement their submission in support of their motion for summary judgment by filing a complete set of Plaintiff's medical records, including the records from the North Baldwin Infirmary. (Doc. 23). On November 8, 2010, Defendants filed a supplemental submission. (Doc. 24). Defendants' motion, Plaintiff's response, and Defendants' supplemental submission are now before the Court.

### III. SUMMARY JUDGMENT STANDARD

In analyzing the propriety of a motion for summary judgment, the Court begins with these basic principles. The Federal Rules of Civil Procedure grant this Court authority under Rule 56 to render "judgment as a matter of law" to a party who moves for summary judgment. "[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact. . . .'" Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).

All of the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Jackson v. BellSouth Telecomms., 372 F.3d 1250, 1280 (11th Cir. 2004). However, Rule 56(e) states that:

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must--by affidavits or as otherwise provided in this rule--set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that

---

"there is no necessity for further inquiries concerning qualified immunity." Saucier, 533 U.S. at 201.

party.

Fed. R. Civ. P. 56(e)(2).

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. . . . If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (internal citations omitted). "Summary judgment is mandated where a party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc., 508 F.3d 641, 647 (11th Cir. 2007) (citations omitted).

## IV. DISCUSSION

As set forth above, Plaintiff seeks redress pursuant to 42 U.S.C. § 1983 for alleged constitutional deprivations arising out of an altercation that occurred on March 1, 2009, while Plaintiff was incarcerated in the segregation unit at Holman Correctional Facility. Section 1983 provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

42 U.S.C. § 1983 (1994). For the reasons set forth below, the Court finds that Plaintiff's allegations fail to establish any constitutional violation by Defendants. Therefore, it is

recommended that Defendants' motion for summary judgment be granted.

    A.  <u>Eighth Amendment Excessive Force Claim</u>.

As discussed above, in his Complaint, Plaintiff claims that Correctional Officer Jonathon Levins used excessive force while attempting to remove him from the segregation unit shower by "snatch[ing]" Plaintiff's right arm "violently" while only that wrist was cuffed, causing Plaintiff to hit his head on the door and causing the cuff to cut into Plaintiff's wrist. (Doc. 1 at 9). In addition, Officer Levins pulled Plaintiff's right arm out of the shower door tray slot and beat it up and down violently seven or eight times. (<u>Id.</u> at 10). Plaintiff also claims that Defendant, Correctional Sergeant Gregory Adams, failed to intervene to prevent Officer Levins' use of excessive force and, indeed, used excessive force himself by spraying "mace" into the shower stall while Plaintiff was locked inside. (<u>Id.</u>). In addition, Plaintiff claims that, after he allowed himself to be handcuffed on both wrists and was removed from the shower, Officer Levins knocked Plaintiff to the floor, hit Plaintiff with his fist, dragged Plaintiff to the elevator, put his knee in the middle of Plaintiff's back, and pushed Plaintiff's face into the floor. (<u>Id.</u>). Then, while en route to the health care unit, Defendant Adams, Officer Levins, and six other officers "beat [Plaintiff] all the way to the infirmary all over his body" and, at one point, picked Plaintiff up and threw him head first into an iron gate, "busting his head open." (<u>Id.</u> at 10-11).

The Eighth Amendment protects a prisoner from punishment that is cruel and unusual. <u>Graham v. Connor</u>, 490 U.S. 386, 394 (1989). Specifically, the Eighth Amendment "prohibits the unnecessary and wanton infliction of pain, . . . the infliction of pain totally without penological justification. . . , [and] the infliction of punishment grossly disproportionate to the severity of the offense." <u>Ort v. White</u>, 813 F.2d 318, 321 (11th Cir. 1987) (citing <u>Rhodes v. Chapman</u>, 452 U.S. 337, 346 (1981)).

In order to establish an Eighth Amendment claim, a plaintiff must prove both an objective and subjective component. First, Plaintiff must show that the alleged wrongdoing was objectively "harmful enough" to establish a constitutional violation, and, second, Plaintiff must show that "the officials act[ed] with a sufficiently culpable state of mind," *i.e.*, that they acted "maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 6-8 (1992). In the prison security context, the factors used to determine whether there has been a violation of the Eighth Amendment are: the need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived, any efforts to temper the severity of a forceful response, and the extent of injury suffered. Hudson, 503 U.S. at 7 (citing Whitley v. Albers, 475 U.S. 312, 321 (1986)).

The question for the Court, then, is whether, under the circumstances of this case, a jury could reasonably conclude that Plaintiff's rights under the Eighth Amendment were violated during the altercation on March 1, 2009.[4] Based on the record, the Court concludes that a reasonable jury could not find that Plaintiff's Eighth Amendment Rights were violated.

Plaintiff admits that, on the evening of March 1, 2009, Officer Levins took him to the shower area of the segregation unit to take a shower and was in the process of removing Plaintiff's handcuffs when Plaintiff insisted that he be allowed to speak to Defendant Adams about the radio that Adams had confiscated earlier in the day. (Doc. 1 at 8). When Officer Levins refused Plaintiff's demands, Plaintiff responded by refusing to allow Officer Levins to recuff him so that he could be removed from the shower. (Doc. 17, att. 1 at 2). Plaintiff continued to ignore Officer Levins' orders to "cuff up" even after Officer Levins struck him

---

4 The Court has considered Plaintiff's allegations of excessive force by Officer Levins, Defendant Adams, and all of the other officers allegedly involved in the altercation *in toto*.

repeatedly on his forearm, and Plaintiff complied only when Defendant Adams sprayed a chemical agent into the shower stall.[5] (Id.).

The evidence further shows, and Plaintiff does not dispute, that he cursed, thrashed, jumped in the air, kicked at the officers, attempted to break free, and screamed that he wanted to die[6] as the officers attempted to gain control of him while en route to the prison health care unit.[7] (Doc. 17, att. 1 at 2; Doc. 17, att. 3 at 4, 6, 8). One officer, Christopher Kimbrel, who assisted in escorting Plaintiff from the shower to the health care unit described Plaintiff's behavior as "aggressive," "irritated," and "belligerent," stating that Plaintiff was screaming "[y]ou can kill me now!!" as he struggled to break free, jumped in the air, and attempted to kick the officers. (Id. at 8). The struggle continued as they passed the "S-9 Grill Gate," and the officers threw Plaintiff to the floor, causing him to hit his head and suffer a laceration above his right eye.[8] (Id.

---

5 Sergeant Adams states in his affidavit that he "gave inmate Wilson a one (1) second burst of CS/OC Chemical spray (Freeze Plus P) from canister # 127 to the facial area" and that "[i]nmate Wilson then complied with the order to be cuffed up." (Doc. 17, att. 1 at 2).

6 Plaintiff states that he was suffering from "a mental health illness" at the time of the altercation. (Doc. 1 at 11-12). His medical records from North Baldwin Infirmary indicate that he suffers from schizophrenia. (Doc. 24, att. 1 at 6, 18).

7 The incident report contains a statement by Officer Levins in which he reported that, while at the shower, he asked inmate Wilson, "What's the Problem?" and "Inmate Wilson stated, 'That Sergeant needs to give me my shit back. I want my shit back.'" (Doc. 17, att. 3 at 4). Officer Levins then ordered Plaintiff several times to place his left arm outside the shower to be handcuffed, and Plaintiff responded, "I aint doing shit! Break that mother fucker! I don't care!" (Id.). When Sergeant Adams arrived, Plaintiff screamed, "You need to give me my shit back. That was my shit." (Id.). When the officers attempted to escort Plaintiff to the health care unit via the elevator, Plaintiff became more "irate" and began jumping around violently, screaming, "I want you bitches to kill me! I want to die." (Id.).

8 Officer Levins likewise described Plaintiff's behavior en route to the health care unit as follows:

> Inmate Wilson continued to act violently throughout the escort to the Health Care Unit. Once inmate Wilson passed the S-9 Gate near the Hospital Holding Cell, his behavior intensified, thrashing around shouting, "I want you'll (sic) to kill me!" Inmate Wilson then jumped into the air, kicking in front of him with both feet. Correctional Sergeant Michael Everette and Correctional Officer Johnny Johnson assisted to restrain inmate Wilson. During the struggle, inmate Wilson was taken to the ground and struck his head on the floor. Once inmate Wilson was restrained, he was brought to his feet and escorted inside the Health Care Unit.

(Doc. 17, att. 3 at 4).

10

at 4,6, 8). When Plaintiff arrived at the health care unit, the nurse noted that he was "hostile" and yelling, "I want to die!" (Doc. 17, att. 1 at 4). Plaintiff was "bleeding profusely" from a laceration above his right eye and was taken to a North Baldwin Infirmary where a CT scan of his brain revealed no hemorrhaging or fracture and an x-ray of his right elbow revealed no fracture or dislocation. (Doc. 17, att. 3 at 5; Doc. 24, att. 1 at 5, 10). Plaintiff received stitches for the cut above his right eye and was returned to Holman. (Id.).

In assessing the factors enumerated above, it is evident that Plaintiff, an inmate who was suffering from schizophrenia, created a disturbance that posed a real and substantial threat to the safety of Officer Levins, Defendant Adams, and the other officers who were involved in the attempts to remove him from the shower and escort him to the health care unit. Plaintiff's behavior undermined prison discipline, order, and safety and justified the use of force.

Although Plaintiff alleges that the officers taunted him on the way to the health care unit by asking him "whether he still want[ed] his radio back" (Doc. 1 at 11), that comment alone is insufficient to indicate that Defendant Adams' motive, or the motives of any of the other officers, in using force against Plaintiff was anything other than a good faith effort to gain control of an inmate who was belligerent and out of control and to prevent the further deterioration of security in the unit. Neither Defendant Adams nor Officer Levins instigated the altercation with Plaintiff. In fact, both officers attempted to diffuse the situation by refusing to engage in the argument with Plaintiff about the radio. Defendant Adams attempted to walk away from the area, and Officer Levins attempted to return Plaintiff to his cell. Neither of those attempts was successful, however, because Plaintiff continued to argue and obstinately refused to leave the shower of his own volition. Furthermore, when Officer Levins began striking Plaintiff on the forearm to force Plaintiff to allow himself to be handcuffed, Defendant Adams intervened,

11

and Officer Levins ceased and backed away as instructed. Indeed, the fact that Plaintiff still refused to allow Officer Levins to handcuff his left hand despite being struck repeatedly on his right forearm suggests a lack of severity of Officer Levins' use of force. Moreover, once Defendant Adams sprayed the chemical agent into the shower stall, and Plaintiff finally allowed himself to be handcuffed, no further force was used by Adams or Officer Levins to accomplish that task. This behavior by Defendant Adams and Officer Levins evidences the absence of a motive to "maliciously and sadistically" cause harm and, to the contrary, evidences an attempt to temper the severity of the forceful response. Hudson, 503 U.S. at 6-8.

That being said, the amount of force allegedly used by the officers while en route to the health care unit warrants additional consideration. Assuming Plaintiff's allegations as true, at one point during the battle to escort him to the health care unit, the officers picked Plaintiff up "six or seven feet in the air" and threw him head first, while handcuffed, into an iron gate, causing him to "bust[] his head open" above his right eyebrow. (Doc. 1 at 11). Assuming that this actually occurred, the Court cannot and does not condone such treatment of prisoners if designed for the purpose of causing "unnecessary and wanton infliction of pain." Ort, 813 F.2d at 321. At the same time, the Court is keenly aware that prison officials must maintain order and discipline "in an often dangerous and unruly environment." Ort, 813 F.2d at 321-22. Prison officials must be extended deference in acting to insure the proper administration, safety, and security of a penal institution. Id. "The infliction of pain in the course of a prison security measure, therefore, does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." Id. at 323.

There is no question in this case that Plaintiff's persistent, dangerous, belligerent, erratic,

and violent behavior inevitably led to the use of additional and escalating force as the officers attempted unsuccessfully to remove him from the shower and then deliver him to the health care unit. Assuming as true Plaintiff's allegation that he received the laceration above his right eye when he was picked up and thrown into an iron gate, not, as Defendant claims, when Plaintiff was "taken to the ground" near the "S-9 Gate" and hit his head on the floor, what is undisputed is that the officers were struggling to gain control of Plaintiff while he was jumping in the air, kicking, screaming, thrashing, and trying to break free. After Plaintiff hit his head, whether on the gate or the floor, he stopped fighting, and the officers stopped using force against him and took him into the health care unit.

Bearing in mind all of the factors enumerated above, the Court finds that the force used by the officers against Plaintiff was substantial, but it was not excessive. Therefore, Plaintiff's Eighth Amendment excessive force claim fails as a matter of law.

B. Fourteenth Amendment Due Process Claims.

As discussed above, Plaintiff also claims in his Complaint that his Fourteenth Amendment Due Process rights were violated by Defendant Adams' confiscation of his radio and by Defendant Watson's failure to have Plaintiff's mental health status evaluated before proceeding with the disciplinary hearing on March 24, 2009. (Doc. 1 at 8, 12). For the reasons set forth below, the Court finds that Plaintiff's due process claims fail as a matter of law.

The Due Process Clause protects against deprivations of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV. The Supreme Court has recognized two types of constitutional protection provided by this clause: procedural due process and substantive due process. See McKinney v. Pate, 20 F.3d 1550, 1555 (11th Cir. 1994).

"The substantive due process clause is rarely implicated by governmental action." Shultz

13

v. Wells, 2010 WL 1141452, *5 (M.D. Ala. 2010). "Officials acting under the color of state law violate the substantive component of the Due Process Clause only when their conduct 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'" Peterson v. Baker, 504 F.3d 1331, 1336 (11th Cir. 2007) (quoting County of Sacramento v. Lewis, 523 U.S. 833 (1998)). "Procedural due process rules, on the other hand, protect an individual from the unjustified deprivation of life, liberty, or property." Walker v. Sun Trust Bank of Thomasville, GA, 363 Fed. Appx. 11, 17 (11th Cir. 2010) (unpublished)[9] (citing Carey v. Piphus, 435 U.S. 247, 259 (1978)).

With respect to Plaintiff's claim that Defendant Adams deprived him of his rights under the Due Process Clause by taking his radio, the undisputed evidence shows that Plaintiff, who was being housed in the segregation unit of Holman prison, was attempting to pass a radio from his cell to an inmate in another cell when Adams confiscated the radio and refused to return it. (Doc. 1 at 8). Standard Operating Procedure 9-013 expressly provides: "[Inmates in disciplinary segregation] are not allowed to pass items from one cell to another at anytime. This includes passing items in person or by use of strings or officers. Items you attempt to pass will be confiscated and destroyed." (Doc. 17, att. 1 at 12). Whether Plaintiff's allegations are interpreted as asserting a substantive or a procedural due process claim, the claim fails as a matter of law.

"The substantive component of the Due Process Clause protects those rights that are 'fundamental,' that is, rights that are 'implicit in the concept of ordered liberty.'" Greenbriar Village, L.L.C. v. Mountain Brook, City, 345 F.3d 1258, 1262 (11th Cir. 2003) (citations and

---

9 "Pursuant to Eleventh Circuit Rule 36-2, unpublished opinions are not considered binding precedent, but may be cited as persuasive authority." Lanier Constr., Inc. v. Carbone Props. of Mobile, LLC, 253 Fed. Appx. 861, 865 n.5 (11th Cir. 2007) (unpublished).

14

internal quotation marks omitted). "Fundamental rights are those rights created by the Constitution." Id. "Property interests . . . are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." Id. (citing Board of Regents v. Roth, 408 U.S. 564, 577 (1972)). Assuming that Plaintiff possessed a protected property interest in his radio, it would be a "state-created right," which is "protected by procedural, not substantive, due process. . . ." DeKalb Stone, Inc. v. County of DeKalb, Ga., 106 F.3d 956, 960 (11th Cir. 1997) ("substantive due process protects only rights created by the Constitution."). Consequently, Plaintiff has no viable substantive due process claim.

Moreover, with respect to Plaintiff's procedural due process claim, even "'an unauthorized *intentional* deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the 14th Amendment if a meaningful post-deprivation remedy for the loss is available.'" Tinney v. Shores, 77 F.3d 378, 382 (11th Cir. 1996) (emphasis in original) (quoting Hudson v. Palmer, 468 U.S. 517, 531 (1984)). "The State of Alabama, through its Board of Adjustment, provides a meaningful post-deprivation remedy for [an inmate] to seek redress for the loss of his property." Blair v. Meeks, 2009 WL 3157238, *2 (M.D. Ala. 2009) (citing Ala. Code § 41-9-60, *et seq*.); accord Watson v. Nixon, 2009 WL 1089684, *1 (M.D. Ala. 2009). Therefore, Plaintiff's allegation that Defendant Adams violated his right to procedural due process by confiscating and destroying his radio entitles him to no relief from this Court.

Similarly, Plaintiff's claim that Defendant Watson violated his right to due process by failing to have Plaintiff's mental health evaluated prior to conducting the disciplinary hearing

(Doc. 1 at 12) fails as a matter of law. Assuming that Plaintiff is claiming a loss of liberty as a result of this alleged deprivation, "[a] liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty'. . . , or it may arise from an expectation or interest created by state laws or policies. . . ." Wilkinson v. Austin, 545 U.S. 209, 221 (2005) (internal citations omitted). State-created liberty interests "will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . . nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995).

Assuming, without deciding, that Plaintiff possessed a protected liberty interest in receiving a mental health evaluation prior to his disciplinary hearing in this case, the undisputed evidence shows that Plaintiff's mental competency was evaluated prior to the hearing, and he was found competent to proceed with the disciplinary process. (Doc. 17, att. 2 at 2). Defendant Watson, who presided over the disciplinary hearing, testified in his affidavit that:

> Administrative Regulation #403 states when an inmate of serious mental illness receives a disciplinary report, the inmate's mental status will be considered in determining the inmate's competency to participate in the hearing process. When an inmate is found incompetent, the disciplinary hearing process will be delayed until the inmate's competence is restored. The inmate's mental status will be considered in the disposition when an inmate with a mental illness is found guilty of a rule violation. The institutional psychologist will assess the inmate's competency and culpability, and provide relevant information to the disciplinary hearing officer.
> Inmate Wilson was evaluated by mental health staff and cleared for the disciplinary process on inmate Wilson to proceed.

(Doc. 17, att. 2 at 1-2). In light of the foregoing, Plaintiff's unsupported allegation that he did not receive a mental competency evaluation prior to his disciplinary hearing provides no basis

for relief in this cause of action.

## V. CONCLUSION

Based on the foregoing, the Court concludes that Defendants are entitled to summary judgment in their favor on all claims asserted against them by Plaintiff. Accordingly, it is recommended that Defendants' motion for summary judgment be **GRANTED** and that the entirety of Plaintiff's Complaint against Defendants be **DISMISSED with prejudice**.

The instructions which follow the undersigned's signature contain important information regarding objections to the report and recommendation of the Magistrate Judge.

DONE this 3rd day of February, 2011.

                                        /s/ Katherine P. Nelson
                                        KATHERINE P. NELSON
                                        UNITED STATES MAGISTRATE JUDGE

# MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS AND RESPONSIBILITIES FOLLOWING RECOMMENDATION, AND <u>FINDINGS CONCERNING NEED FOR TRANSCRIPT</u>

l. *Objection*. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this court. Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the Magistrate Judge. *See* 28 U.S.C. § 636(b)(1)(C); *Lewis v. Smith*, 855 F.2d 736, 738 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. Unit B, 1982) (*en banc*). The procedure for challenging the findings and recommendations of the Magistrate Judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a 'Statement of Objection to Magistrate Judge's Recommendation' within ten days[10] after being served with a copy of the recommendation, unless a different time is established by order. The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection. The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made. It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection. Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2. *Transcript (applicable Where Proceedings Tape Recorded)*. Pursuant to 28 U.S.C. § 1915 and FED. R. CIV. P. 72(b), the Magistrate Judge finds that the tapes and original records in this case are adequate for purposes of review. Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

DONE this 3<u>rd</u> day of February, 2011.

                 <u>/s/ Katherine P. Nelson</u>
                 UNITED STATES MAGISTRATE JUDGE

---

[10] Effective December 1, 2009, the time for filing written objections was extended to "14 days after being served with a copy of the recommended disposition[.]" <u>Fed. R. Civ. P.</u> 72(b)(2).